Case number 16-1202. Aviation Suppliers Association, Inc. Petitioner v. Michael P. Huerta, Administrator at ELLE. Mr. Dick Stein for the petitioner, Mr. Capel for the respondent. Good morning. May it please the court. My name is Jason Dick Stein. I represent the Aviation Suppliers Association, or ASA. The court has asked us in a notice on Wednesday to discuss mootness, and with the court's permission I'd like to skip past the statement of the case and jump right into the mootness argument. Thank you. The relevant standard for mootness is going to be found in Los Angeles County v. Davis at the United States Supreme Court level, and in cases like Dovey-Harris at the D.C. Circuit level. And it establishes that there are two conditions that must be met in order for the court to establish mootness, or in order to dismiss a case as moot. The first of these is that there is no reasonable expectation that the violation will recur. And the second is that it must be plain that the mooting action has completely and irrevocably eradicated the effects of the alleged violation. And in this case, to be blunt, Notice 8900.380 does not render this case moot. For starters, the notice is temporary. The notice expires this August, August of 2017. I would suppose that you received assurance, let's say credible assurance from the FAA that in fact, it seems to be suggested in the document itself, it would be made permanent with, I guess it's a change 7 to the MAG. You're right, Your Honor. The document itself says that it will be made permanent in change 7 to the maintenance annex guidance. For starters, there is no schedule currently for a change 7 to come forth. And in addition, there is no legal obligation for the FAA and the European Aviation Safety Agency to agree to a revision 7. See, I would have thought one of your answers to Judge Williams would have been, it doesn't moot it because there's nothing in the notice that says ESA agrees to it. Right? Yes, you're perfectly right, Your Honor. In addition, under the American Steel, I'm sorry, I'm going to have to look at the citation on this one to make sure I get it right. Suppose, just to follow up a little further with Judge Williams' question, suppose that counsel for the FAA tells us not only that it will be in MAG 7, but that the European Agency agrees to it. Does that moot it? It doesn't, and it's going to not moot it for two reasons. First of all, under the American Iron and Steel Institute v. EPA case 115F3979, that was a situation where the EPA had actually superseded a permissible exposure level for mercury. And in that case, the court pointed out that the agency's subsequent statement could be withdrawn, it could be stricken down by a review in court, or it could be ignored by local EPA officials. Similarly here, a notice which is issued with no process whatsoever could also be rescinded with no process whatsoever. No, but my question was if FAA counsel tells this court that it will be included in the MAG and the European Agency agrees, tells this court that? And we put it in our opinion. And if that is the situation, then we still have a problem, Your Honor. And the reason for that is because the notice itself didn't fix the problem. I thought you said in the brief that it did. No? The notice attempted to fix the problem. And actually, if you look in the opening brief at pages 59 and 60, we say that it did so ineffectively. And I apologize. It was based on the fact that it was temporary with no assurance of it becoming permanent. Because mootness at that point in time had not been pled or there was no motion to dismiss for mootness, we didn't get into the details because we didn't want to waste the court's time. But in fact, the notice 8900.380 directs that a repair station can issue an 8130-3, but repair stations issue 8130-3s according to the FAA's instructions. And the FAA's instructions are published in FAA order 8130.21H. Under that order, there are actually several different types of 8130-3 tags. A repair station is allowed to issue an 8130 that declared that a part is repaired, modified, or inspected, but they're not allowed to declare a part to be new. And if you take a look in your appendix at page 102, you will see the specific language of the maintenance annex guidance that is offensive to us. That actually directs that it must be an 8130 that is issued to declare the part new. If you take a look in the FAA order that I mentioned, 8130-3. Just to simplify a bit to make sure I understand this, your concern about this whole change in the guidance is that it requires the repair stations to be willing to issue an 8130 before installing new components, correct? We're only talking about new components. No, Your Honor, I'm sorry. There are two sorts of documentations involved in this, and I think that's probably very confusing. Or not the 8130, or the FAA equivalent of 8130. It's definitely confusing because until you just said this, I did not understand that there were two different 8130s. The 8130 is used as sort of a hybrid document. It's used at the end of maintenance as an approval for return to service. So a repair station that does work completes one of these tags to say, I completed my work. But in addition... But that's not the issue in this case, is it? Correct, it is not. All right, so... The parts in the United States under U.S. law typically don't have to be documented that way. Europeans prefer them to be documented that way. And when they are documented as new, until a year ago, the only people that could document them as new were the FAA and the FAA's own designees. One year ago, roughly a year ago, on October of 2015, the FAA promulgated a new rule that will allow manufacturers upon application to begin documenting parts as new. And one of the problems is that we have billions of dollars of inventory in warehouses that don't have these tags. These are parts that were made by FAA-approved manufacturers. But doesn't the new notice allow the repair station now to issue the 8130? It allows them to issue the form, the 8130, but it doesn't allow them to tag the parts as new, which is what the maintenance annex guidance requires. So the maintenance annex guidance requires that the part be tagged as new, which is still a function that only a manufacturer or the FAA itself can do. The repair stations under the existing order, 8130.21H, only have the authority to tag it under the non-new categories, inspected, repaired, altered, modified, overhauled. So basically, they're tagging it in a way that they can't accept under the MAG. So there's a disconnect, and that's actually one of the problems with the notice. I wish the notice had gone through notice and comment so that we could have actually pointed out to the FAA that the notice isn't getting us to an end point that we need to be at. So the notice has problems because it's temporary. The notice has problems because it doesn't actually fix the problem. But the notice also represents the sort of voluntary cessation that the Atlantic Richfield versus United States case, which this circuit decided, has described as a voluntary cessation. And while we have the hypothetical of what if the FAA was to come forth and say, we're going to be committed to a revision 7 with the Europeans, the fact is that the FAA hasn't done that, and they can't do that without some sort of acquiescence by the European Aviation Safety Agency. Are manufacturers not doing this? I mean, this has been out for a little while now. Are manufacturers just not doing this? They're just spewing out parts that can't be used? I apologize that I'm going to bring in matters that are outside of the record. But to answer your question, I will tell you that manufacturers, some, have started to do this. However, large manufacturers like Boeing itself have said that they do not want to take advantage of the 14 CFR 21.1370 privilege because of some of the international concerns. It was fully negotiated with the Europeans. We, unfortunately, failed to fully negotiate it with the rest of the world. And other countries like China and Japan have actually said that they are uncomfortable with that sort of 81.30. So in addition to the existing inventories, the billions of dollars of existing inventory that is untagged, we still have parts coming out of some companies that are either untagged or that don't have manufacturer's tags but instead continue to have DAR tags. Now, this only applies to that percentage of parts that a repair shop is going to put into an EU plane that is broken down in the U.S., right? In theory, that is the case. However, in practice, repair stations typically, when they have both certifications, have to sign off for both jurisdictions. What percentage of the planes that a repair shop prepares are EU ones that have broken down here? It's got to be a small one compared to all the U.S. planes and all the other international planes. Your Honor, you don't issue an 81.30-3 for a complete aircraft. You issue an 81.30-3 for a... What did you just say? I just didn't hear you. You don't do what? Typically, repair stations work on components. So they'll issue 81.30-3 tags for components. You don't issue that tag for a complete aircraft. I see. So much of the work that's done in the United States by repair stations, they're not working on a whole aircraft. They're actually working on a component, like, say, a terrain collision avoidance system, a TCAS system. So they'll get parts to install into that TCAS system. Under the maintenance annex guidance, each of those parts needs one of these tags, the 81.30-3. And one of the problems is that, in practice, we haven't required that in the United States. In the law, we haven't required that in the United States. So there's a lot of these parts sitting in warehouses today. I just want to back up again on practically. Those parts that you guys have and that are sitting in the repair shops can be used in probably 90%, 95% of the planes out there, right? I don't know how many broken-down E.U. planes there are here in the U.S., but it's got to be a small percentage. And so why can't your client's inventory or your member's inventory be used for all of these other planes that don't have this requirement? And the reason for that is because most repair stations may not actually know where that terrain collision avoidance system is going. Even an operator may not know. So if your client is Delta, your client Delta is going to bring that terrain collision avoidance system back in. And Delta, who does its operations through Delta Technical Operations, Delta Tech Ops is actually going to ask for that to be dual-certified because they might put it on their own aircraft, but they also do maintenance for other air carriers, including European carriers. So they're going to ask for it to be dual-certified so that they can put it on whichever aircraft ends up needing it. Well, does that mean that – let's go way beyond – but does that mean – you talked about Boeing and making parts. So the parts you're talking about here, I assume, are parts that go into Boeing aircrafts owned by European carriers, right? Is that right? I mean, if the European airplane that's here is an Airbus, that's not part of this, correct? Or is it? That would only be – well, yes, you're right. That is not part of this. And the reason is because the Airbus part doesn't get anyone's company. So the universe is even smaller than you indicated in answer to Judge Boulat, right? We're only talking about American-made airplanes owned by European carriers there in the United States, right? I thought you were saying that those repair shops assembled the whole system for installation in a plane. Right. And at the time they did the assembly, they did not necessarily know the ownership of the plane for which it would go. That's absolutely correct. And, in fact, that TCAS unit that I mentioned as my example may go over to Delta Tech Ops and sit on a shelf until the next aircraft that needs a TCAS, which might be a Delta aircraft, so it might be unregistered, or it might be a British – well, it wouldn't be British Airways. I don't think they do British Airways. But it might be, say, a KLM aircraft. And at that point in time, because it's an EU-registered aircraft, they need it to be European-certified. As a practical matter, the way that they make sure they're ready for this is they ask for dual certification. Why wouldn't they just have, here's the bin of things that can go in the EU ones and here's the ones – if this is a more expensive process, I would think that these companies would have the separate bin for the EU pieces and these cheaper, because they're not going to require this form and all that processing, parts that can go in everything else. It seems nuts to me that they would want to spend all this extra money when it's only a tiny portion of their inventory that's going to go where this requirement applies. And I wish that they would follow your business model, but a TCAS unit might cost $100,000. If you have one TCAS unit that's certified for both European and US-registered aircraft, now it's ready to go on whoever's aircraft comes in and needs it. If you have to have two separate inventories, then for that one unit, now you've got $200,000 worth of inventory instead of $100,000 worth of inventory. So maintaining two separate inventories becomes tremendously expensive for the repair stations that need to maintain inventories. Not to mention the warehouse space that's necessary to hold two separate dual inventories. And that's one of the reasons why operators and repair stations are going to be looking for dual certified parts and why, as a practical matter in the industry, that dual certification has become so important. Can I ask you, if the EU is requiring this, regardless, how would any ruling affect, redress, either be caused by or redressed, whether it's caused by the FAA guidance or redressed by this court? Because at the end of the day, those repair shops want, that's what you just told us, they want the tag. They want the dual certification for the parts that have been worked on. They want the dual certification that complies with the EU regulations, right? And if the EU regulations require it, then they're going to insist on it anyhow, are they not? And there's two answers to that. The first answer is the EU regulations don't really require it. They require it for certain types of parts, but they have a whole list of exceptions. The EASA regulation that applies here is EASA 145.A.42. I couldn't figure out which exception you thought applied. The main one that actually gets used is the unserviceable exception. But that's just categorization. And then Section B of that very provision says that it's going to have to comply with regulatory requirements before it can be put into service. So you were quoting, I think, Section A of that exception, which had the three categories of serviceable, unserviceable, and salvageable. But it's Section B right below it that says, look, it's not going in the plane. The plane's not going anywhere unless it meets the requirements. So it's not an exception from the requirement. And actually, we've got two stages, if you will. The first stage is getting the part in the door. In order to get the part in the door, for a dual-certified repair station, first they've got to get a part in the door. To the repair station. Yeah. And that's where A serves as a categorization, is under 145.A.42A, you've got to get the part into the repair station by putting it into a category. Now, if the part fits into an unserviceable category, there are other regulations that actually say you can't go to that B, the installation, until you've actually investigated the part and found it to be airworthy. And you're the one that just said they're not going to have other parts there that don't meet the tag requirement. So why would they bring it in in the first place? And even if they bring it in, they're going to, I guess, use it for some other plane. But they aren't going to put it in an EU plane unless it's got that tag. So at the end of the day, if they don't want the two dual inventories, they're going to insist on the tag. But the European system actually has the tag for that A1 provision, but it doesn't actually require the tag across the board. It creates safety valves that allow you to bring in an untagged part. Doesn't this all mean, excuse me, doesn't this, what your clients want is dual certification, correct? That's what they want. Well, my clients want to be able to sell the parts from their inventories. I get that, but my question is if they want to be able to sell parts that can be installed in European permitted aircraft, right? But doesn't that mean that FAA is right that you lack standing here because that's a judgment only the European agency can make? It's just not redressable in this court. Well, actually, as I said when I started answering Judge Millett's question, there's really two responses. The first response is that there's safety valves in the European regulations. That's what we were talking about, and I didn't think it fit. The safety valve that applies to your situation, that's the only one. Okay. The safety valve is going to be 145.EVAP42. Apologize, let me find that. 131, appendix 131. 145.A.42? Yes. Right, that's where A says here's how you classify the components, but B says prior to installation of one of those components, the organization shall ensure that the particular component is eligible to be fitted, which puts us right back into the 8130. That's not a safety valve. That puts us right back into the 8130 requirement, does it not? I apologize. I see where your confusion is, and I should have explained the difference between bringing the part in and eligibility. Eligibility is usually a separate function from bringing the part in and categorizing it. The normal way that someone's going to find eligibility is either through a statement of eligibility, so PMA parts, for example, are required to have statements of eligibility, and that tells you it's acceptable for this aircraft. Normally, though, the repair station is actually going to look into the repair manual and see what's the part number that's eligible for this repair, and that's how they're going to decide if it's eligible. It's going to be eligible if it's got the tag. It's going to be ineligible if it doesn't. Actually, I'm sorry to say no to you, Your Honor, but eligibility within the terms of art used in the industry is going to be different from the documentation. This is the language of the European Union. I don't know if they subscribe to your industry art within the United States, but they've been quite clear that you can't install these things unless they have this form, whether it's the FAA equivalent or the EU one. I guess I don't see any language. There's a separate regulation that I think you may be alluding to, MA501, and under the Part M, they actually say you have to have one of these forms unless you fit into an exception. Right, but you haven't found an exception yet. And the unless clause cross-references Part 145's exceptions. Right, but that doesn't sound – saying that components can be segregated into categories is not an exception to a requirement for installation in the plane. That's what I'm not – you're just pointing to something that says you can group these things into different categories. There's no language that I see in A that eliminates the requirement that before it goes in the plane. That's because the B eligibility isn't a documentation requirement. It's actually a – Pretend there's no B. Show me an A where it says it can go in the airplane without the tag. You said this is your exception. There's no clause in the European regulations that says it can't go into the airplane without the tag. You're saying it's implicit in the opening clause prior to installing, installation of a component. Is that right? Well, actually what – It's a special thing. Right, I'm sorry. A is the provision that says you distinguish the parts, you categorize the parts. Elsewhere there are regulations, and I apologize I can't cite them off the top of my head, that specify that for the parts that are found unsalvageable, they actually have to be subject to some form of a maintenance activity such as an inspection before they can be found to be serviceable. Once they are inspected and found to be serviceable, and they can be inspected and found to be unserviceable or unsalvageable, but if they are inspected and found to be serviceable, then they move into that serviceable category, which are the parts that can be installed. And actually there is a guidance material, a GM published under the EASA system, that explains that when that's done internally, the repair station has the option of either tagging the part internally and then using it, or they can actually write a procedure that allows them to not do the extra tag and just use it. And the European system works with untagged parts that way just fine. The fly in the ointment becomes the maintenance annex guidance. I'm sorry, can I just back up? Because the special conditions require the form. No, I'm sorry, the special conditions don't require the form. And actually I said earlier that there were two reasons, and that was where I was going with the second reason, which is the special conditions between the United States and Europe. Procedures for the release or approval for return to service that meet the requirements of EASA Part 145 for aircraft and the use of Form 8130.3 for aircraft components. That's for 1.1.1? Yes, that's for the approval for return to service. So after the part's been installed and the work is done, the repair station has to complete an approval for return to service. But there also has to be the form for the aircraft components. And then I thought you said you acknowledge the requirement, but there were safety valves. And then when you look at the safety valve and it doesn't have the language, at least as I'm understanding it, you're saying there's no requirement. So maybe I'm missing a step here. And doesn't 145.8.5OD require the form as well? I'm sorry, can you give me that citation again? 145.8.5OD? 145.8.5OD. It's in DOG. I feel like I'm probably not getting something. We're going in circles here on, yes, it's here, there's exceptions. We look at the exception, and then there's no requirement to be an exception from. And I guess let me kind of walk you through a process, I guess, of a repair. So repair station has a unit that comes in to be repaired. They're going to need to buy some new parts to install into that component that gets repaired. Those new parts come in and they have to verify that they're airworthy when they come in, and they have to also verify that they're eligible for this particular unit before they actually install them. So they're going to bring them in, and when they bring them in, they're going to fall under 145.8.42, those categories, serviceable, unserviceable, unsalvageable. And then they're going to look in a repair manual and say, are these eligible? Because these are the part numbers that are called out in the manual. And if the answer is yes, they'll go ahead and install those into the unit. When they're finished with the work that they do, they have to complete an approval for return to service or a maintenance release. That's a different documentation exercise. Is that a maintenance release of the repaired item or the components in the repaired item? No, I'm sorry, this is for the whole work that is done. Right. So when they do work on a component, they have to actually fill out a maintenance release for the component that was worked upon. It is unfortunate that we have done this to ourselves, but we use the 8130-3 for the maintenance release, the approval for return to service at the end of the repair station's work. But also when the FAA issues a tag saying a part is good, which unfortunately they don't do for every single part, but when they do, they also use the same exact form. It's got two signature blocks, one on the left side and one on the right side of the form. The right-hand signature block is for approval for return to service. That's what the repair station does at the end of the work. When the FAA says a part is good, they sign on the left-hand side. And the maintenance annex guidance actually says that for your inbound parts, the parts have to be certified as new. That's that left-hand signature that the FAA and also now manufacturers can make, whereas when they're talking about an approval for return to service following maintenance on a component, that is the right-hand signature. So essentially the main— Just to understand your theory, is it that the EU regs only require that 8130 at the end of the whole repair process, which is different from the 8130 that their reg is attaching to the components, or do you agree that the EU regs require each piece, the components, the nonstandard components have a tag but that you can find exceptions to it? I just want to clear that thing up first. I wish the system was as clean as you had just described it. I'm asking how you understand the requirement. All right? When do you think they have to have—a broken engine has come in. They need new nonstandard blades or whatever, some nonstandard part for that engine. Before they can put—and it's a KLM engine. Before they can repair that, are they only allowed to put the parts into that engine that have the 8130 or FAA equivalent tag? No, that is not a limit. That's not an EU limit, but that's a— I've got to do this in baby steps with you, I'm afraid. Your view is that it's not an EU requirement but is required by the guidance that you're challenging? Correct. I think if I walk through this from the European side, it might make things more clear because I can use two different forms then. No, you're going to make me more confused at this point. So in your view, the EU regulation will let them put any old serviceable part in there without a tag as long as at the end of the repair job they can attach a tag? Well, first of all, I don't think I'd go so far as to say any old part. Any serviceable part. Because if the part comes in without a tag, then there's actually an obligation on the repair station to inspect it and find it to be serviceable, and there's a second obligation that they have to confirm that it's an eligible part, so it's one that's called out in the manufacturer's manual. That's how the EU regulation sets the thing up. And did you not begin our conversation today saying these repair shops are not going to take our parts under those conditions? They don't want to have two different systems in their inventory. They want it to come in ready to go in either one. I thought that was your argument. Sure, they would like it to come in and be ready to go. And that's why they're not taking your stuff under the new guidance. Well, they're not taking our stuff under the new guidance because we're having trouble getting these 8130s to attach to these parts that haven't had them in the past. And they don't want to do it themselves. They want it to come in ready to go. Well, actually, before the MAG came in, the Europeans and Americans with dual-certified shops were taking those parts in, and they were using other indicia of airworthiness. So the FAA, for example, has another advisory circular, 20-62E, that lists different indicia of airworthiness that repair stations can use. And it says you can rely upon things like part markings, or you can rely upon the commercial documentation that shows that it came out of a production approval holder. These are the things that have historically been used. You're saying this notice under challenge, the MAG under challenge, extinguished all those. Is that right? It did. And it did so in contravention of the actual annex that it's supposed to be guiding. So the annex says, as you pointed out, that if you want to be dual-certified, you would apply to the FAA, and the FAA inspector would look at your manual and see, do you meet the 11 special conditions concerning manuals that are listed there? And then they'll come and they'll inspect and see, do you comply with U.S. regulations? Because the Europeans in the maintenance annex said, if the repair station meets U.S. regulations plus these special conditions, that's good enough. And they do require that at the end of the work done by the repair station, the repair station has to sign an approval for return to service on an 8130-3 tag. But those special conditions didn't say that your inbound parts that will be consumed had to be documented in any special way. You said that – I just have two questions. Number one is, I understood you saying that the remaining problem is with respect to new parts, right? Yes, Your Honor. Okay, but I'm looking at the language of the August notice. It says, inspection may be performed on new parts received on or after October. It says new parts. So it's saying here that the parts that don't have the tag. That's what the notice says. Yeah. And the notice actually tried to fix the problem. It says new parts. What didn't it fix? It didn't fix it as far as I understood you from your brief because it isn't permanent. That was the only thing I got from your brief. Yes, Your Honor. That was the only thing that we had indicated in the brief. The other problem, which we didn't brief because mootness was never raised as an issue, was that we have found that the notice isn't working in practice. Well, forget practice. We have a case before us based on the record here and the arguments you've made. And am I right to think that but for whether or not this notice is permanent and blessed by the Europeans, it would satisfy you, correct? No, that is not correct because of. It says new parts. Yes, but it also says that the repair station can issue an 8130 as an approval for return to service. They're not allowed to certify the parts as new. And that's the requirement in the language of the MAG that is the problem. My second. I actually wish that the notice had been effective. I wish the notice had given repair stations the ability to actually certify the parts as new instead of as inspected in Block 11 of the status block of the 8130 because at least on a temporary basis it would have made things easier. Last question. What kind of order could we issue against the FAA that would redress your injury? The order could be as narrowly tailored as an injunction against the FAA enforcing the documentation element under the appendix. What would be the basis of that order? Would it be that the FAA notice doesn't comply with European standards? We don't have any authority to enforce European standards. I would say that the first basis for that order that I would point to would be that the FAA in establishing the documentation requirement affected commerce and infringed the commerce clause by taking an action affecting commerce without appropriate congressional delegation of authority. Did it violate the Constitution when it said it should? Wait a minute. Can't you just reframe that as arbitrary capriciousness? I would be happy to reframe it as arbitrary capriciousness, Your Honor. Well, what are you doing? So what's the argument? What would we order the FAA to do that would solve your problem? It looks to me like what you want is you want to be sure these parts are certified for installation in European airplanes. Whether they're certifiable for European airplanes is a question for the European Union, not the FAA. The FAA makes recommendations to the EU. And, in fact, the European Union and the United States have entered into an agreement, the maintenance annex, which establishes the parameters under which these parts will be acceptable. The maintenance annex guidance added an element that was not in the maintenance annex. So they're actually violating the maintenance annex, because the maintenance annex has a mechanism for The FAA said this was an agreement with the Europeans. Now I'm really confused. Why don't we go ahead and get the FAA? You can come back up later if we have more questions. You have three very perplexed judges here. So let's see if the FAA can help us, and then we'll come back to you, okay? Let me say this back to you. Go ahead. What you've said in the oral argument for which I've found no clue in your opening brief or your reply brief. And I apologize for that. I feel like I've gone outside the record to answer questions. The record was very limited. Okay. Let's hear from Mr. Koppel. Go ahead. Thank you, Mr. Court. I'm John Koppel from the Appellate Staff Civil Dersion. Could you begin by doing your best to explain to us how you see this issue? Yes, Your Honor. The court's – what the court was driving at in its questions is absolutely right. What the petitioner – What the questions were – we weren't getting any facts. Tell us what is actually going on here. What is actually going on here is the petitioner is seeking an advisory opinion from this court with respect to a matter of European law. That's your argument about stamping. I'm asking you to explain about these 8130s, when they're needed, when they're not needed. Would you just explain that to us from your perspective? Right. What the petitioner is seeking with respect to the 8130 is the petitioner – basically, the petitioner wants to be able to sell as new components, components without provenance, components of uncertain provenance, components without the Form 8130 tag. They want to be able to certify them themselves. Well, they want to be able to say that those are new parts. They want to be able to market them without any documentation, without a Form 8133 documentation requirement. But to be clear, they don't want to take on the work of putting on the Form 8130 verification, right? They want the repair shops to do it. Right. Well, that's the repair shop's responsibility under the regulations to ensure that any part or any component, when it's installed, has the Form 8133 tag, either as a new release, the so-called left-hand release on the form, or as a maintenance release, which is the right-hand release. And to be clear, on the right-hand, is that something that was unserviceable, is made serviceable, and then tagged? Yes, that would be one such situation. But the petitioner and the petitioner's members basically do not want to have to comply with the Form 8133 requirement at all. They don't want to have to, or they don't want the repair shops to have to comply with it at all, because their theory is that this reduces the value of their parts, because then the repair shops will pay less for the parts, because they have to inspect them, and they will charge for the inspection process that way. So that is why we do agree with the petitioner that the dispute isn't moot, because they are saying they want an order essentially requiring, as a matter of European law, that there is no requirement for repair shops to have the 8130-3 form when they install a part, either as a new part or as a part undergoing maintenance. So you agree your point is it's not moot because this August notice is only the FAA's position, correct? Well, it's not only—no, actually it is consistent with the European Union's view, but it's— Well, how do we know that? Well, you—I don't think you can really—you can say that you know that through the record. It doesn't say in it that the European—that ESA agrees to it, right? No, I don't believe— Well, it doesn't. No, I don't believe— And previous notices do that are in the record, right? Previous notices that are in the record actually say in several places that ESA agrees to the notice. This one doesn't. Well, I don't believe that there is any disagreement with respect—ESA or EASA, but it is not— it certainly—I agree that the notice does not explicitly say that, but this new notice is entirely consistent with the MAG change itself because it requires the Form 8133, and this is why it's unacceptable to the petitioner. But it—see, it doesn't—what it does not do is it does not grandfather the part without any documentation requirement, which is what the—which is what was done prior to—for parts that were installed prior to October 1, 2016. It does not do that. Going forward, it requires the repair stations to—or it enables the repair stations to use the Form 8133 prospectively. And—but—so that's—it does not—we agree with the petitioner that it does not solve their problem, but we think that their problem cannot be solved because it's a matter of European Union law. Your brief had an allusion to a safety valve, but then it never went on to describe what that safety valve was and the scope of it and why its existence is not a problem for you. It seemed momentarily to be an agreement between you and the petitioner, but then it seemed to disappear because you didn't develop it. I'm talking about passage of page 20 of your brief. Safety valve may not be the exact word. Well, we do recognize that there are some limited—very limited exceptions to the—to the Form 8133-3 requirement in the EASA regulations. But those are—those are, for instance, with respect to certain components that are undergoing maintenance, which I believe is 142 or 145A-50D, and also with respect to certain other components that are fabricated by the maintenance organization in the course of doing its work. Well, can you explain why—respond to their argument about 145A-42? They say that's the safety valve. Why else would you have these unserviceable parts let into the bins at all? Your Honor, we disagree with that characterization. First of all, 145-42A begins by—with a step—A-1 begins with establishing the general principle that, you know, that components should be released on the EASA Form 1 or equivalent. And that is— Wait, where is—145.8.42? 145A-1. No, I'm at A-1. 145A-42. That's when I'm at. A-1. And that is sort of—that is consistent with the maintenance annex guidance at MA-501A, which is really—which is what controls here. That's in the components section. It says no component may be fitted unless it is in a satisfactory condition, has been appropriately released on—released to service on an EASA Form 1 or equivalent, and is marked in accordance with Annex 1. Unless otherwise specified. Unless otherwise specified. Now, the principle— Including in Part 145. So we keep going in a circle here. That's right. But the circle—but it actually ends because Annex 2, Part 145 does not do what the petitioner says it does. That's what I would like you to explain to me. It's—it really simply— What does it do then? It reiterates that the—that there's the basic requirement of the EASA Form 1 or equivalent, and then there are limited exceptions to it. Or sort of the—but actually it all—it's entirely consistent because ultimately whatever—with those limited exceptions for things that are undergoing maintenance or fabricated by the maintenance organization, there is an absolute requirement across the board that there be either a EASA Form 1 or equivalent with a component whenever it is installed on an aircraft. Is that what B does, or is B's use of the term eligible there something different? No, Your—I do not think that there's any daylight there or any difference. And MA 504, which says control of unserviceable parts, which deals with unserviceable parts, highlights that at MA 504A3, which says a component shall be considered unserviceable in any one of the following circumstances. Three, absence of the necessary information to determine the airworthiness, status, or eligibility for installation. And why do they say you can—what is the point of saying you can accept unserviceable components if you can't use them? But you can use—you have to—to inspection, you can determine that they are serviceable, but then you still have to put on the Form 8130-3 as part of the—as a maintenance release. So that is—that is the way the European system works. And the petitioner—again, to highlight the standing problem, this is a matter of European law, and the petitioner is asking the court to issue an order that essentially really is an advisor opinion because it will not—it's not binding on the European Union. The EASA is not a party here, and it simply—it would simply be an empty declaration that does not— does not get the petitioner's members what they want. Well, they also want— And that's why it's not moved, right? That's the reason why it is not moved. Yes. Yes, Your Honor. That is—that is why it is not— FAA has no authority to moot the case, correct? That's correct, Your Honor. This is a European requirement. Which is why there's no standing, right? That is correct, Your Honor. And the guidance that they want enjoined is jointly issued by you and EASA. That is correct. That is correct. So it's not for us to issue an injunction that would say the EU got EU law wrong. Yes. Which is what we would have to do. That is absolutely right, Your Honor. What does it mean at—I think it's addendum 16, where it seems to—that's where it is— Does that mean that the FAA issued this, issued 8900-280, is confident that the EU will agree? Well, yes, Your Honor, it does. Even though, as I believe Judge Tatel mentioned, it doesn't say that this was cleared with EASA. As a practical matter, I believe that that's exactly right, that it has been, and the FAA is confident that this will—that EASA will agree. EASA agrees with this. This reflects the—this is consistent with European Union law. The problem with this is not the absence of EU approval, but the fact that it doesn't go as far in retreating from change 6 as the petitioner wants. That's correct, Your Honor. And we do not—we wouldn't say that it's really retreating from change 6 at all, but it certainly doesn't give the petitioner what it wants, and that's why we do agree with the petitioner that it's not moved. So if there are no further questions— I'm sorry, can I just clarify one more thing? Because he talked about things having to be tagged new, and I thought from the briefing they had to be tagged serviceable. Is that the same thing? No, they have to be tagged either—well, it's either—well, they're new components and they're used components that are described in change 6. I thought this whole case was only about new, and then within the new it has to be tagged serviceable. It really is—the petitioner's focus is on the new parts requirement, but what they want is for parts, as I said, of uncertain provenance to be treated as new without any Form 8130-3 requirement, and that is simply not consistent with EU law.  Thank you. Mr. Dixty, we took you way over your time, but you can have two minutes if you would like it. Could you devote that to explaining what it is that you believe the EU permits but is nonetheless forbidden by the FAA-EU document that you are challenging? Well, if the EU permits it, why did the EU sign off on this document, this change, this guidance? The answer to that forces me to go way outside of the record, Your Honor, and I am happy to tell these stories, but— It seems essential to your showing standing. So if it isn't somewhere evident in the documents you put before us, then it would seem to me you don't have standing. The belief seems to have been that because European manufacturers often issue EASA Form 1, but United States manufacturers typically do not issue the 8130-3 tag, there's a tremendous inventory of parts that don't have these tags, which the government called parts of uncertain provenance. That is absolutely not true. These are parts manufactured by FAA production approval holders that have other indicia of airworthiness. So there's other reasons to believe that these are good parts. It appears that part of what was behind this was a belief that if we can inhibit these parts from going into repair stations, then at the end of a period of time, these parts will have caused what are known as AOGs, aircraft on ground. They will have caused reliability problems in U.S.-manufactured aircraft. The reliability problems aren't real reliability problems. They're paperwork problems. Those reliability problems don't appear to have arisen or would not appear to have arisen for European aircraft because Europeans typically, for many of their parts, issue the EASA Form 1. And I can tell you that even though that seems to have been the theory... You were discussing the practical problem. Let's assume you're right, but you have not begun to answer my question, which was to identify something and something in the record that would tell us about it that is permitted by the EU with respect to the use of parts, obviously, that is forbidden under this document. And the answer to that is that if you have a European repair station, they're going to bring in parts and they're going to ask for these 8130-3s on parts. If the parts don't have them, then they're going to have to be brought in as unserviceable. You're describing how it operates on the ground. You're not describing a distinction between what you understand in EU requirements and the FAA United States requirements. And the EU requirement, very simply, is that within the European Union, they make use of the unsalvageable safety valve to bring parts in without documentation. We haven't had a documentation requirement under U.S. law, and that's one of the reasons why the maintenance annex didn't impose... If I understand this correctly, the EU has signed off on this set of requirements for U.S. repair stations. Actually, if I am understanding the FAA correctly, the EU has not yet signed off, but they believe that the EU may sign off on this. Wait, the guidance was jointly issued? Yes. Okay, that's what we're talking about. The guidance says you need to have the form 8130 on the parts, and that was jointly issued. I think that's what Judge Williams was talking about. I'm sorry, yes, the guidance... It seems to be a monolithic position of saying that the EU permits that which a document that it has signed off on forbids. That certainly goes beyond our ordinary competence. One of the reasons that we are here today is because the Europeans basically allowed the FAA or negotiated with the FAA to enter into this maintenance annex guidance that contravenes the actual annex, is not actually imposed in Europe, and undermines U.S. competitiveness by taking parts that are known to be safe and saying they can't be used. The EU has signed off on it, but it snookered the U.S. I would not disagree with that characterization. I get it. Anything else? No. Okay, case is submitted. Thank you. Thank you, Your Honor.
judges: Tatel, Millett, Williams